rnal Revenue. Good morning. Neil J. Block for the taxpayer in this case, James Benenson Jr. I'm going to try to briefly summarize our position. We have five reasons why we believe that the DISC commissions paid by SUMA Holding Inc. to a DISC, which is indirectly held by a Roth IRA, constituted deductible expenses to SUMA Holdings Inc. and did not, therefore, constitute a dividend income to James Benenson Jr. The first is that this case has been now in the third court, the same facts, same individuals under different levels of jurisdiction. The Sixth Circuit heard the SUMA case. The Sixth Circuit decided that the commissions were deductible expenditures. They were not dividends to Mr. Benenson. They were not dividends paid by SUMA Corporation. I think you can assume that we're familiar with both the Sixth and the First Circuit decisions in the case. Okay. The only point I would like to make about the First Circuit is that the First Circuit held that the income earned by the Roth IRAs in question was dividend income from a DISC, indirectly from a DISC, not as the result of constructive contributions, as a result of Mr. Benenson's receiving constructive dividends and then giving them the money to his children, who then made excessive contributions. It would have to be helpful because there are unusual issues concerning claim preclusion in tax cases. The fact that you . . . I'm sure you're gratified with the victory in the First Circuit, but you're kind of starting from ground zero here, so you've got to please bear that in mind. Yes, but . . . everything's a but. We were asked by the First Circuit to commit to being bound by the decision in the Sixth Circuit with respect to the parties, the Benenson father and children. Second, the Sixth Circuit, while only having jurisdiction over the deduction, was placed in the position by the respondent in that case, by the government, of having to deal with every issue that's been before all three courts. In other words, it was not a specific selective item that was presented. The position of the government was that this is an unbelievably severe attempt to stuff a Roth IRA through improper actions, and they gave the entire improper stuffing of the Roth IRA as part of the entire case. In fact, it was the main case, that if you would have allowed Mr. Benenson's company to pay the discommission and have it respected, we never would have been able to stop such a thing. So the point being is, when you get to the privity, when you get to race judicata, when you get to the other factors, you have the situation, which was raised, by the way, in the Macy case, which I was going to get to next, by the dissenting opinion, when he says that why was this case restricted simply to the deductibility of the discommission when the government itself put the entire issues that were before this court and before the First Circuit in front of the Sixth Circuit? And the Sixth Circuit's opinion, therefore, in order to be a complete opinion, held that there was no dividend. And by the way, the Sixth Circuit does have the jurisdiction to decide if a company paid a dividend or not. That's under their jurisdiction. The jurisdiction here is whether or not Mr. Benenson received a dividend when the Sixth Circuit said he did not. So I don't see that this is bound zero. I know the circumstances are a little different, but if the decisions in the Sixth and the First Circuit went the other way, I expect that your client would be asking us to look at the issue anew here, taking the view that he and his liability were only before this court. So given the strict rules about offensive use of claim preclusion against the government, are you arguing that you demonstrate privity on this record, or are you just taking the view, well, the government only gets to litigate this question once, no matter who the parties are? I would remind the Court that if we had lost in the Sixth Circuit, we would have lost in all the circuits, because we agreed to be bound by the Sixth Circuit opinion. In fact, we were asked by the First Circuit to bind ourselves in order to get a delay in the hearing on the First Circuit, and then this Court Mr. Benenson, Mr. and Mrs. Benenson agreed to that? Yes. And is that a part of the record before us? Do we have whatever the concession that had to be given to that court was? I'm not sure that I saw it. We gave it to that court, and we gave it to this court. Where is it in our record? Is it a part of the record? Yes. In fact, until we gave the commitment to be bound by the Sixth Circuit opinion, we did not get a postponement of the hearing in this case. We only could get a postponement of the briefing in this case by making that commitment, and that . . . And did you ask for a reciprocal commitment from the government? No. Why not? I mean, if you had to give it, why didn't you ask the government to have to give it then? The request we got from the First Circuit was that we give the commitment and that the government would not be bound. Okay. Why don't you get to the merits here? Well, the merits are fairly simple, and that's why I was mentioning the First Circuit. And by the way, I would like to mention before I do that, the Mazie case has abandoned the theory of the tax court in our case because the Mazie case is basically a companion case to this case involving a foreign sales corporation rather than this case. And in the Mazie case, they addressed the holding in this case indirectly and stated they were no longer of the opinion that ownership of disk stock by a Roth IRA provided the opportunity of disallowing commissions to the disk and involved in reallocating it to the shareholders of the related party, which would be Mr. Benenson. And this First Circuit opinion focused on the Mazie case majority opinion and concurring opinions that they were not taking the position that ownership of a disk by a Roth IRA . . . In a nutshell, why do you think you should prevail? Easily because . . . We know the First Circuit's opinion, we know the Sixth Circuit's opinion, and we know the relevant cases. Why do you think you should win? We should win because the code specifically provides for what we did. And there's two sections of the code, Section 995G, which addresses the payment of a commission to a disk owned by a Roth IRA and which says the dividends from that disk to the Roth IRA are unrelated business taxable income. And without that provision, the dividends to the Roth IRA would not have been allowed tax. They would have been taxed without any tax at all because under the disk provisions, there is no limitation on shifting of income from a related supplier to the disk. It would be paid when it was distributed. Let me ask you about . . . If SUMA sets up the disk, and your argument is that's permitted by law, but then I'll call them the sons, their Roth IRAs purchase shares in the disk. That's not correct. No? No. What do they purchase shares in? The Roth IRAs formed the disk. The disk was originally formed by the Roth IRAs, and the disk stock was issued to the Roth IRAs as original issue. There was no purchase . . . How did they create the disk? I thought only the export company could create the disk. That's not correct. Well, then help me out. You're going to have to be patient. That's fine. That's what I'm here for. A disk is simply a corporation which can be organized by anybody. One of the anybodies is the Roth IRA. The Roth IRA is the incorporator of the disk. It is the original subscriber to the disk stock. When the disk stock is issued, all there is is a corporation with shares outstanding. How does it come to be that SUMA's money earnings wind up in that disk? SUMA's money winds up in that disk because it enters into an agreement with the disk. It's what they call a safe harbor agreement, which is protected by the code and the regulations, which states that SUMA will pay the disk a commission, or it will be a buy-sell disk. You can either have either one, and that commission will be income to the disk, not subject to any reallocation provisions under Section 482 or really under any other provision because Congress provided for the disk to receive that income. The disk is an export benefit. We keep on losing it, but the disk itself was designed to encourage exports, and the way they did it was through the Domestic International Selling Corporation. And that's why most disks, if I understand the literature I've read, are owned by the same entity that's putting the money into them. Well, that's incorrect also. I'm just full of mistakes. No. Go ahead. I think we're trying to get educated, hopefully, anyway. Today, virtually all disks are not owned by C corporations, and the reason is that it's disadvantageous from a tax point of view to have a C corporation receive dividends from a disk because the dividends are taxed at full corporate rates, and even though they've dropped to 21 percent, they're still higher than if the disk is owned by the shareholders of the related supplier. Well, I'm sure I'm going to be wrong about this, too, but, you see, the problem I have with what you've just outlined is that now that I understand that the disk was created by the Sun's Roth IRAs and that SUMA was putting millions of dollars of its earnings or its earnings of its subsidiaries into it for no good reason, I mean, as far as SUMA's concerned, it might as well have dumped the money in the river, I'm concerned about whether this is a permissible use of a disk. Help me out. Okay. If we had a SUMA corporation and the disk was owned by the children of Mr. Benenson and the children had no stock interest at all in the SUMA corporation, that structure is perfectly permissible. It's been blessed by numerous rulings, and, frankly, it's been expressed by Congress and nothing's been done about it. So the structure of having the disk owned by the shareholders of a C corporation avoids corporate tax at the C corporation level, only taxes the income to the shareholders of the disk, and that is considered to be perfectly permissible. Let me ask you this. The substance over form doctrine contemplates that each step of this transaction was code compliant, but still disallows it. Why doesn't that doctrine apply here? It doesn't apply here because Congress did not intend it to apply here. Congress intended that there be nothing done by the disk to earn its money and that its income be distributed to its shareholders. But did Congress intend for this device to be used in conjunction with the Roth IRA to, as your adversary would have it, exceed the contribution limits to the Roth IRA? Section 995G was enacted for traditional IRAs. The Roth IRAs did not exist at the time. Right, but the key and the point that was relied upon by the Sixth Circuit, the First Circuit, and hopefully this circuit, is Section 408 Cap A, small a, of the Roth IRA provisions, which states that unless it is otherwise provided by the code, not by the regulation but by the code, a Roth IRA is to be treated the same as a traditional IRA. And as the majority opinion said in the First Circuit, that is a commandment that the Roth IRA be treated the same as the traditional IRA. And if 995G treats the traditional IRA as having received disk commissions and paid UBIT income, then that's a Roth IRA. And I'm trying to be educated here. That may mean that everything here is literally from a textual perspective in compliance with the rules, but I don't understand that necessarily to answer the question whether the substance over form doctrine can be invoked. And I'm not seeing how this arrangement fulfills the purpose of what Congress intended with either the disk or the Roth IRA. So help me understand that. Well, when Congress passed 995G, of course, it was directed to a situation where a disk was owned by a traditional IRA. Not a Roth IRA because those hadn't come into existence. They hadn't come into existence. So then we have to say, well, then, why do you think that a Roth IRA is subject to the same rules? And the rule is that the first sentence of the code and almost of the regulations is that unless the code provides otherwise, and that says the code. It doesn't say some theory of the code. Unless the code specifically provides otherwise, and that's what the regulation says, the Roth IRA is to be treated the same as a traditional IRA, and a traditional IRA is allowed to receive disk commissions and pay tax on it. That was the theory of the First Circuit. And with all due respect, we're making the argument that principles of comedy would allow you to give deference to another circuit's opinion, and in this case, of course, it's the exact same facts that we have. And so when you're saying why doesn't substance versus form apply, and the answer is because Congress didn't intend it to apply, and there's certainly no provision for that in the Roth. May I ask you about if we were dealing with a traditional Roth IRA and if we could for a moment eliminate J.C. Holding, just go SUMA to the disk to a traditional IRA. The Roth IRA? No, traditional IRA. Okay. If the money, the dividend payment had been made to a traditional IRA, then am I correct that what would happen is when the IRA holder withdrew the money, he would pay taxes on it? Yes. Okay. So what you're saying is that a Roth, because it's a very different vehicle, the dividends get paid to the Roth holder and they continue to earn tax-free interest because that's the nature of the Roth. Yes. And if Congress does not like what happened in this situation, it has to change it. That is correct. Okay. Now let's put J.C. Holding in the mix. What happened here, as I understand it, is J.C. Inc. pays the dividend to J.C. Holding and it pays corporate tax on it and then distributes it to the Roth IRA. Did I get that one right? No. I'm sorry. Go ahead. The disk is owned by J.C. Holding. Yes. So when the commission is paid to the disk, then the disk pays a dividend to J.C. Holding, which is subject to full tax. Right, and J.C. Holding paid that. Yes. Right. And now what is it that J.C. Holding paid to the Roth IRAs? Was it dividends in J.C. Holding? J.C. Holding paid a dividend to the Roth IRA, and because it was not from a disk, there was no tax at the Roth IRA level, but the same tax was paid at the corporate level, and that's why there's no tax savings by virtue of using J.C. Holdings, only the fact that, as was found in the First Circuit and the stipulations, that J.C. Holding allowed the company to be run without the Roth IRA custodian getting involved. Allowed J.C. Holding or allowed J.C. Inc. to be involved? No, J.C. Holding to take the actions of a corporation without having the approval of the shareholder. Now, if J.C. Holding had not been in the picture, though, if the money had gone right from the disk to the Roths, would there have had to have been the corporate tax or no tax? No. Yes, tax. Yes, okay. But not corporate tax, the UBIT tax, the unrelated business income tax, which is the same tax as on a corporation. And in the First Circuit opinion, what the court did was basically go through the structure of the holding company owning the disk stock and then being owned by the Roth IRA and pointing out that everything fit together the way Congress intended. All right. Now, this case, because of the circumstances, has been in three courts with each court having different players in front of it. We have Mr. Berenson, Jr., and his wife in front of us, right? Correct. All right. Their conduct that the IRS is concerned with is the initial action of SUMA setting up or SUMA entering into agreements with J.C. Inc., is that right? They're saying that by allowing SUMA to pay the money to J.C. Inc., they effectively, the Benensons, were finding a way to give a tax-free gift. Yes, but to get there, they had to receive a constructive dividend. And the point I'm getting at with the First Circuit that has jurisdiction over this case, there was no tax-free gift because the income comes in as a constructive dividend. Now, there's a case called Helwig. One interesting thing about the decisions at the appellate court level is that they've been sticking with pretty much what the code provides. But there's a case called Helwig v. Commissioner where the service did allow a disk commission to be paid to a disk owned by a Roth IRA. But the service contended that even so, there was an excise tax that was due because the excise tax provisions are different from the income tax provisions. Therefore, there could be an actual dividend paid to the disk owned by the Roth IRA, but under the excise tax provisions, they did not have to give credence to that payment. The tax court in Helwig said, look, under the Supreme Court decisions, you cannot have a gift tax on a transaction unless you cannot have an income tax deduction. In other words, what the Helwig court said is, if there is a deduction allowed on the disk commission, there cannot be a constructive gift because for that purpose, gift tax and income tax have to be interpreted in peri materia. Ms. Bloch, we've kept you well past your time. We'll still give you rebuttal, but let's hear from the government now, okay? Thank you. Good morning. May it please the Court. Ellen Del Sol from the Department of Justice for the Commissioner of Internal Revenue. I'd like to just touch briefly on the preclusion issues, which we've laid out very thoroughly on our brief. We think the First Circuit got it correct that res judicata doesn't apply, and I would just emphasize that each court can only decide what's before it and within its jurisdiction. As laid out in our briefs, we also think this is not a— Respect to the Sixth Circuit decision, am I mistaken in that Mr. Benenson controlled that litigation and basically is SUMA? Did I misunderstand that? Well, I think there's a question in that regard, Your Honor. But first of all, before you get to that question, I think our view of Mendoza is explained in our briefs, and I think it's that it doesn't leave any exception for a privity-based exception to the rule that there's no non-mutual application of collateral assault against the government. The whole point of Mendoza's analysis is that the special litigating status of the government and the way it litigates across the country and makes its decisions about whether to seek further review requires certainty with regard to whether it's going to be bound in a later suit. And when you have different parties to allow in the second suit an allegation of privity to be made and an argument that the government should be bound, that you don't necessarily know how it's going to come out, doesn't warrant application of collateral assault against the government. And I think to create a question of can privity be an exception would basically undercut that, whether, you know, there could be all sorts of different situations where taxpayers or other parties against the government might come up with privity claims in the second litigation. And I think the second circuit— This is a little different. I mean, we have—the Court has acknowledged, the Supreme Court has acknowledged that when the parties to the two lawsuits are the same— Right, but I think there— Now, you know, I understood your whole point to be that Benenson is SUMA. Benenson Jr. is SUMA. Well, I guess there are a couple of questions there, Your Honor. First of all, I think he did—the stipulated record does show that when the transactions took place and when this was set up, he did control SUMA. He was a minority shareholder in terms of voting interests, but he also controlled the trust, which was for the benefit of the kids, that was the other major shareholder. So he did have—the stipulations do reflect that he was in control at the time of the transactions. I think the waters have been muddied by the arguments made in the First Circuit where the Sons argued that they had privity because things had changed and they were shifting in ownership and they had taken over the management of SUMA by the time the litigation was ongoing and when the case was before the Sixth Circuit. And I think that's exactly the kind of factual situation that Mendoza's design— the First Circuit didn't consider it because it wasn't in the record, but the fact that there is that factual question and they've, in fact, raised it. And I would just also emphasize that the Seventh Circuit in Cantor encountered a similar situation and declined to expand Mendoza to create any sort of privity exception in that context. So I think the Seventh Circuit's view in Cantor certainly is consistent with the argument we've made in our briefs and that to apply a privity exception would run into a conflict with that as well as with the reasoning of Mendoza. And I guess I would just also add that because different taxes are an issue, Sunan talks about there needing to be exact identity of issues. I think there's also a question of whether we even have the exact identity of issues here because there are different types of taxes and different arguments that might be considered. And then I would also point out that— Your argument on the merits is that when Suma put money into this disk, basically that was all Mr. Benenson. That was Mr. Benenson and his sons in collusion at least to do this, you know, working together. I mean, there may have— One moment. My understanding is that the transaction you want taxed to the Benensons personally because you're taking the view that the payment of money from Suma to a disk which on its face is permissible and on its face is a transaction between two entities, that now you're saying, no, no, that was a payment of money to the Benensons. Have I understood you correctly? Well, I think, Your Honor, what happened was the payment to the disk that went basically in a circle back to the Benenson family. You're taking the view that it was a payment to Mr. Benenson. Otherwise, I don't know what your tax theory is here. Well, Your Honor, I think whenever there's a circular flow of funds that might start with one family member and end up with other family members, the courts routinely have said that's a constructive dividend. And the fact that it doesn't actually end up with Mr. Benenson himself is not necessarily— We don't have to get to the sons, do we, for your theory against the Benensons. You're taking the view that Suma's payment of money to a disk that they didn't own was a payment to the Benensons who then decided to give a gift to that other entity. Well, what I think we're saying here, and I think the Court doesn't necessarily have to say that the disk— I think there are two different approaches that the Court could take, which would be, one, because it's not bound by re judicata, to say that the transfer of the deduction, the transfers of the disk, wasn't something that we'll consider happened and consider the money as being transferred from the Benensons to their son. I apologize if I'm not making myself clear, but try to listen to me and answer what I mean. The judgment you're trying to sustain in this appeal is against the Benensons. That is correct, Your Honor. You'll decide what you're going to do with the First and Sixth Circuit decisions, but all we're deciding is whether Mr. and Mrs. Benenson have to pay personal income tax on this money that they put into the disk. That is correct, Your Honor. And the theory of that is that this wasn't Suma's corporate money, or this was a payment from Suma to the Benensons. Well, Your Honor— Well, what's the theory? The theory is that they used a circular route— Finish the question, please. I'm sorry. I'm sorry. Go ahead, Your Honor. What's your theory of this being income to them? Where corporate shareholders use a circuitous route to shift money back to members of their family, that situation creates a constructive dividend, because even though they did shift the money out and to the disk and then back around to the Roth IRAs, those Roth IRAs benefited their family, and in that situation where money has gone in a circular route back to the party who would have been entitled to it in the first place in order to avoid taxes, courts have applied the judicial doctrines to treat that as what it really is at the end of the day as a matter of economic reality as a constructive dividend. Your theory—and let me be sure—I didn't mean to—you finish now. No, no. Go ahead. Explain to me what I'm missing here. As I take each step of the money from the dividend from the export as it goes through J.C. Holdings and J.C. and ultimately into the Roth IRAs, it seems to me that each step was code compliant, and the government's theory is that at the end of the day, this transaction had no economic substance and that it was simply a device, if you will, not contemplated by Congress to let these people who had their Roth IRAs at a level higher than the code permitted. Therefore, the substance over form doctrine disallows this scheme, they said. Well, I think that's correct, Your Honor. That's a fair summary. That's a fair summary, and I think Judge Lynch in the First Circuit got it exactly right when she said you look at the entire facts and circumstances. And I think, you know, there are two approaches one could take to dealing with the disk payment, and one, I think, is for this Court to say it's not bound by what the Sixth Circuit did in terms of analysis and agree that really this should be treated as a payment to the Benningsons, which they then contributed to their sons' Roth IRAs, because that's what happened at the end of the day. This was basically a spigot through which summa money could be moved to these Roth IRAs where they could have tax-free investments. Judge Sutton and Judge Stahl explained their view at some length that at each step there was code compliance. Well, I think . . . Judge Sutton said, well, you know, he didn't think it was appropriate to graph this substance over form doctrine on, and Judge Stahl said essentially the same thing. Well, I think as Judge Lynch explained, the facts and circumstances inquiry includes looking at what was the economic reality of what happened here, and what the Roth acquired in the disk, you know, in terms of its interest in J.C. Holdings, which in turn held the disk J.C. Export, was not a real equity investment. This Court said in the TIFD3E or Castle Harbors, as it's more commonly called, case that you look at whether something's an equity investment based on whether it has upside and downside risk. First, sir, it was concerned that you never objected to the bona fides of that transaction. I understand that paying $1,500 to invest in an entity that within a few years returned millions raises concern, but I'm not sure it's the concern you had raised at any point in the arguments. Well, I think we raised that there was no risk associated with it. I mean, normally when you buy stock, you put the money that you're putting out there at risk, that the business will go belly up and you'll get nothing. There you go, that the Sixth Circuit took the view that you're dealing here with two entities, disks and Roth IRAs, that are created for the purpose of minimizing or avoiding taxes, and so that takes us a little out of the normal economic reality sphere. What's your response to that? Well, I think that, yes, disks are outside the normal economic reality sphere, but the whole idea behind Roth IRAs was that they would actually be making real investments. The idea wasn't that they were supposed to be making investments that didn't carry the normal risks and economic realities. So Roth IRAs are not precluded from holding stock in a disk. So can you give me a sense of what a legitimate form of such holdings would look like? Well, I think the best thing I'm able to come up with is, well, there are a couple of possibilities, and one might be the disks do have to be owned by individuals with some relationship to the related supplier, which I think answers your earlier question about the disk relationship with the supplier with which it contracts. It can't be completely unrelated. But there might be a situation where a minority shareholder IRA owns the stock and there actually is use of the disk for its deferral purpose. There might be a situation where the disk actually does have some business. It's permitted to be a shell, but it doesn't have to be a shell. So there might be situations where an IRA investment could be legitimate and where there is, you know. Let's deal with practicalities here. If instead of paying them $1 million, they'd gotten paid $1,000 on a $1,500 investment, would we have a concern here? Well, I think, depending on when and how that happened, it might not violate the contribution limits, even if it were a disguised contribution. No, paid as a dividend. Nobody's arguing it's a contribution. I mean, it seems to me that one of the concerns that's animating all of this is the dollar amount. That if this had been a lesser sum, you wouldn't be as concerned here with them having orchestrated it this way, because, you know, there's nothing illegal about what was done. That everybody agrees. But it was designed as a transaction to move. It would be designed for the exact same purpose. It's just that they only gave them $1,000 instead of $1 million. Well, I think that wouldn't be problematic because it wouldn't necessarily violate the contribution limits. You know that in 2008, the sons weren't eligible to make any contribution to the IRA. Their incomes exceeded the limit. I think, Your Honor — That's what I understood from the record. That is correct. You're right, Your Honor. So, in 2008, they got a million-plus dollars. I mean, whatever it was. And I'm asking you, if they got a distribution that was $1,000, would you be laying it a contribution, which they aren't entitled to make? Or would the view be, well, maybe that's a fair return on an investment. It's almost 1,000 percent, 100 percent, but we're not going to fuss about that one. Well, I think it's a matter of looking at all the facts together, Your Honor. And I think if it were just like one year where there was only $1,000 at issue, that might not make as persuasive a case. But when you look at the totality of the facts about how much was moved over time, the tax avoidance motive, the fact that there was no real economic investment in the stock, I think it's really a totality of the facts question. And each situation might take it outside that realm. It's not like taxes didn't get paid on this money. Well, that's not right. They were paid by J.C. Holding at the corporate rate, right? That is correct. But that's true of all Roth IRA contributions, that there's a payment of tax before the money goes in. The tax savings comes in the fact that the reinvestment after you put the money in the Roth IRA and other investments would be able to grow for years without tax. If you just slow down a little bit, you could understand the point of what I'm asking you. Okay? Sure. You want the money from the parents at the personal rate instead of getting it from J.C. Holding at the corporate rate. Isn't that what's going on here? That's certainly our argument, Your Honor. That's your argument in this court because these are the people in front of us. Yes, Your Honor. That's correct. Okay. One of the things the law generally likes to see is notice to people about what their obligations are. In these circumstances where you concede that all the transactions were lawful and taxes were paid by the corporation, what is there that would have told the Bennisons that they had to pay this as personal income taxes? Well, Your Honor, if you look at Notice 2004-A, it was issued fairly early on and before these significant transfers started happening. And that notice, this is a listed transaction, and it explains the different ways that the service might deal with these transactions and the adjustments that it would anticipate making. The First Circuit was not persuaded by that notice argument, so why don't you tell us why we should be? Well, I think the notice doesn't just say only where there's a transfer not for value, which in this case I think just the facts on their face indicate the transfer wasn't for value, even without evaluation analysis. And then I think that, you know, additionally, the notice itself is much broader than the wording that Judge Stahl's opinion would indicate because it talks about the transactions described are substantially similar transactions. And the earlier transactions in this context did use different types of entities like C-corporations, and as those have not been successful, taxpayers have gotten more creative with using different types of entities. And I think this is exactly the kind of situation that where there's a— That would be the Rapetta case. Rapetta was the one with the C-corporation. And Macy, then they've used the Foreign Sales Corporation. But I think these kind of situations where taxpayers use different entities to try to insulate a transaction that's not permissible is exactly what the substance of reform doctrine is intended to address, what the judicial doctrines are all about, about looking at was this what Congress really intended. And I think the wording of the notice with respect to substantially similar transactions would certainly bring this within the fold of that notice. What is Congress intended when it's drafting provisions of the tax code, essentially provisions that are designed to let taxpayers, whether they're corporate or individual, use certain devices to lower their taxes? Well, I think as the Ninth Circuit cautioned in Brown, particularly when they are using these tax-minimizing provisions, it's the role of the courts to look carefully at whether the taxpayers are trying to stretch those provisions to do something that wasn't what Congress intended. And here we have a very particular provision that limits contributions to a Roth IRA to a certain amount per year to a few thousand dollars. But if they had gotten somehow, you know, back in 1985, gotten, you know, $1,500 worth of Microsoft, or Home Depot, or Google into their Roth IRAs, they'd be in the same position. Yes, but that would be a legitimate investment that reflects economic reality, not part of a tax-avoidance scheme. And I think in this situation it's important to recognize that when Congress enacted the DIS provisions and then changed them— But if they were entitled to put these shares into their Roth IRAs, these holding shares, then they were doing what the law allowed. Well, I think the issue is that Congress, when it enacted 995G, was addressing an entirely different transaction at a time when Roth IRAs didn't exist. They were trying to address the fact that people were using all kinds of tax exempt entities, not just Roth IRAs, to own the DIS to try to avoid tax altogether. And so the idea of this scheme would not have even occurred to Congress then. And the First Circuit did ask me about whether there had been any other congressional action on this, and I wasn't aware of any at the time. But when I went back and we did some further digging in preparation for this argument, it did come to my attention that there were several staff of the Joint Committee on Taxation Reports that did note this transaction between 2005 and 2012. But each time they pointed out that the service was dealing with this through Notice 2004-8, and I think that gives some—the fact that Congress never then took it up even in committee or as a bill indicates that they may have looked at it and said this is being dealt with by—through the judicial doctrines and recognized that taxpayers were coming up with all these different approaches to insulate the transactions. So why should we, in a sense, redo the tax code under this form over substance—substance over form doctrine? Isn't this a problem that if Congress wants to fix, Congress should fix it? Isn't our job to apply the code, these tax minimization provisions of the code as they were written? I mean, if these people were clever enough to generate themselves a windfall, why should we step in? Well, I think the Supreme Court in court holdings and this Court in the Salomon and the Goldstein cases that are cited in our briefs encountered similar situations where the tax courts did something clever to—excuse me, where the taxpayers did something clever to generate a windfall for themselves, and this Court stepped in and said no, that's where these judicial doctrines come into play. And very often in those cases, then it was complete tax avoidance, right? Well, I— Here the problem is that they paid corporate tax and you want them paying personal tax. Well, I think that the issue is that they didn't pay—in those cases it wasn't complete tax avoidance, but some sort of minimizing tax avoidance. I mean, I think in the Salomon case it was an issue of moving assets around amongst related companies to try to reduce the tax that would ultimately be— Every single American, with insignificant exceptions, is going to do whatever they can to lower the tax liability. That's the way this society functions. Well, I think another thing that should have given the taxpayers notice is Revenue Rule 8154, which I think doesn't actually support their position but rather supports the government. They suggest it means that the disk has to be valued at what it was worth at the time that the disk stock was acquired. But if you read that Revenue Ruling as a whole, it's a gift tax case that deals with when dominion and control over property is transferred, and it's looking at a situation where the parents gave their children an interest in a disk, and at the time the disk stock was just—its initial capitalization was transferred. That was a gift just in the few thousand that was the initial capitalization. And then that ruling said that every time more money was transferred, that was a new gift. It wasn't like if you gave me—if my father gave me stock in Facebook, I wouldn't get a new gift every time Facebook earned a dividend, but rather that would be my dividend income. But what this Revenue Ruling is saying is that every time a transfer is made, that's a new transfer of money. And effectively, if the father's in control, then he's making a gift to his sons, and that would be a contribution to the Roth IRA and a contribution to the limits. And it's just— Consumer is owned in part by the Benenson's and in part by the Benenson Trust. Now, how does the tax work, if we would agree with you? How much of it is a dividend to the Benenson's and how much is a dividend to the Benenson Trust? The parties stipulated, I believe—I can't remember the exact numbers, but it's in the briefs and in the stipulations regarding the division between the Benenson's and the Trust. But are you seeking payments from the Benenson Trust? I thought you were only seeking payment from the Benenson's as individuals. Your Honor, initially in the tax court, the dividends allocable to the Trust were also pursued. And near the end of the proceedings, the commissioner determined that actually the correct party in interest when you have a beneficiary of a trust receiving a constructive dividend is that the beneficiary should be taxed rather than the trust, which would have been the Benenson's sons. At that point, the statute of limitations had run on any further adjustments as to them, and therefore the deficiency entered as to the trust was zero just because of that error, which unfortunately was too late to correct. Let me make sure I understand this then. So you're willing to give the corporate tax in its entirety back to J.C. Holding because you encouraged them to file the claim. You can't pursue personal income tax against the sons because that's expired, and the Trust is the majority owner of— It's only a slight majority, Your Honor, but it is a majority. So it seems curious to me that you're going to be better off getting personal income tax from the Benenson's on part than corporate tax on the whole. Well, I think that the important thing here, Your Honor, is to get a correct result that addresses this transaction. You've got parties who complied with the law. They paid taxes. You may have more money in hand with the taxes they've paid than you're going to recover in a lawsuit, and you can easily deal with this matter by going to Congress and telling them they've got to deal with the way this applies to Roths versus traditional IRAs. I mean, it's just curious to me that we're litigating this, and you want a circuit split so that you can collect less money for the Treasury than they paid you on the corporate tax. Well, I'm not sure that's actually the case, Your Honor. I haven't done the computations, but I would add that part of the problem is that Congress doesn't always act. My job is to try to get the right result. You don't happen to think that's a good way of dealing with the allocation of power. Seriously, are you telling me that you may get less money from the Bennisons paying personal taxes than you got from J.C. Holdings paying corporate taxes? That's what you want? I have not done that calculation, Your Honor. Well, I would think somebody should. Isn't that what this is all about, is getting money for the Treasury? Well, I think, you know, at the end of the day, even if, you know, to get the right result in this case is what we're aiming for. What you're going to get is a circuit split. Okay. But, you know, if there were a circuit split, I think that would deter additional use of this kind of transaction. I think, you know, the Wall Street Journal already published an article, which we cited, I think in our brief, that talked about, psst, if you want to avoid taxes, get a disk. And I think that is, you know, an indication that this is a problem that needs to be addressed. One more time. I am troubled by what a line would be if we went with the substance over form argument between a legitimate transaction and an illegitimate one, other than, oh, if it's a lot of money, it must be illegitimate. And so is it your position that once you exceed the contribution limits in any given year, that's got to be, there's something wrong with that holding? You mean in terms of if the earning, if the investment earnings of the disk? I mean, I think maybe that would be something that would warrant, let's look at what the ownership structure is, and that may trigger looking at the paperwork and the transaction at the administrative level, you know, just in the same way as, you know, huge home office deductions might trigger looking at it, and it may or may not lead to an adjustment, depending on what you find. I think the key things are that something's planned as a tax avoidance transaction or market. Minimization. Everybody in America does that. And I think the other things are that there was, you know, I'm going to slow you down because I want to hear them all. Well. Okay, the fact that this was preplanned is one factor, and we're responding, well, yeah, everybody plans to minimize their taxes. That's called being in a. The fact that there's not an investment, a real stock investment carrying risk and that transfers the interest in everything you're going to get. I think their valuation, although we didn't specifically address that here. That's going to be true of every disk, right? Every disk will have. It's not a real stock investment. It's a place to park money. That is true. So that can't be the critical thing. The fact that the same family controls, there's the interrelated control within a family. Okay. Is that all on that? I think the fact that the disk was never used as it was intended. The Supreme Court said in the Boeing case the disks aren't intended to give undue benefits to taxpayers. And here they use the disks not to get the tax deferral the disks were intended for. And I think like the conduit cases like the Picard and Salvatore case we cite in our brief where one entity is just used as a conduit to move money through, that those cases apply the substance of reform doctrine. And then you also . . . You said the disk wasn't used as it was supposed to have been used. Well, the purpose of the disk was to provide a deferral mechanism to put the corporation that has export sales more on par with the companies that are doing business. That's exactly what they used it for. And they paid the taxes ultimately when they made the transfers out at the rate they were supposed to pay it at. No, Your Honor. The record here shows that there was actually no deferral. They paid the taxes right away, darn it. Well, they paid the tax on the money going out of the disk, but they didn't take advantage of the purpose of the disk. They paid the unrelated business income tax. They paid the unrelated business income tax. And I think I need to emphasize here that what's important is, you know, you're talking about the taxes in 2008, whether we collect more. But if they're able to shift this money into the Roth IRAs, and they did shift millions in contribution of the contribution limits, that's 30, 40 years to whenever these sons retire and take their money out. All you're charging them for that is $68,000 each, right? I mean, that's what the sons each have to pay for having made excessive contributions to the IRA. Well, the excess tax continues until the excess contributions are removed. So that's the assessment for 2008. Right, but that's your claim against the sons. That's not your claim against the parents. But I think in substance of reform, you look at, you know, is what's being done, what Congress intended and what the statutes involved, which are both the Roth IRA and not just the disk statute, but also the Roth IRA provision were intended to provide. What do you think the parents owe? I'm sorry? Tell me again. I'm going to be short and clear on this. What do you think the parents owe? I can get the exact number if you'd like. It's about $500,000, I think. Order of magnitude. That might be the total dividends, and then it's the tax on that. There was one factor that we asked you about, and we interrupted, and so you didn't finish telling us about. You mentioned valuation as a factor in the substance of reform, and knowing that this is a proper invocation of substance of reform. Right. I mean, we didn't do a valuation here, I think, because it didn't seem – first of all, it's a very difficult and would be a very litigious process, I think, to arrive at a valuation for the stock. But I don't think the stock is just the par value at the time that the transaction – the transfer of ownership to the Roth IRA occurs. But as Revenue Ruling 8154 reflects, it's all the additional transfers that might come. And if, for example, you had a situation where you transferred stock and it came with not only whatever capital was in the company at the time, but with contracts like exist in the disk situation of future money that's supposed to come in or a requirements contract or something like that, experts have statistical methods of doing evaluation that involve looking at all these factors and deciding what number should be the valuation of the stock. And that process would be an expensive litigious process. And here I think it's very obvious that this stock, as long as it's held by the family, since somebody, Mr. Bennison, wants to transfer lots of money to, is going to be worth a huge amount of money. But as soon as that disk stock was held, the normal valuation inquiry is, what would a hypothetical third party pay for it, like you or me? And the answer is nothing, because there would be no guarantee that anything would continue to flow, particularly since they're not using the disk in any other way that would reflect using it as something to deal with their qualified export income or anything like that. I mean, the idea was to flow it back to themselves. And so I think those issues made us think that it wasn't necessary to bring in an expert and do a real valuation analysis, but that we could point to the economic reality. But I think certainly it's very clear here that there is a disparity. Thank you very much. Mr. Block, you have two minutes in rebuttal. First of all, 8154 stock at any given time is its underlying asset value. The reason they didn't bring it up before is because it's in a private, it's in a published ruling of the Internal Revenue Service, and the tax court has held on the Rauenhardt case that once a position is taken by the service on something they can't go back and litigate against it. 8154 says disk stock at all times has a fair market value equal to its underlying assets. What's the significance of that? The significance of that is that the argument has been raised on appeal, because it's never been raised before, that somehow or other the acquisition of the disk stock should have resulted in some huge amount of income because it was worth so much money at the time it was acquired. Your question was, well, what did they purchase the thing for? Well, they didn't purchase the stock for anything. It was just a newly incorporated company. 8154 just simply says — Your adversary's point is, if you just are doing a hypothetical, what is that stock worth? If you knew the whole arrangement, if you knew that the contemplation is that we're going to use this stock to invest in a Roth IRA with commission payments, and we have a company that we expect will generate such commission payments for the foreseeable future, that stock looks valuable. 8154 says it's always book value, but — and that's why it's a gift tax ruling, and, of course, it doesn't apply anymore because it was held invalid. But the second part is that when disk commissions are paid, then an additional gift is made each time. But the fair market value of the disk stock initially is just book value. It doesn't get value until disk commissions are paid, and when they're paid, that's when the gift took place. It's not a valid ruling anymore, but that was the position. But they started out by saying the disk transaction has a business purpose and that the fair market value of the disk stock is book value. Now, I've got — Can I just ask if you could address the significance of Repeto? I think you probably have a very good way of distinguishing the case, but one initial look at that case is just, gosh, if it were a C corporation, you can think of this as excess Roth contributions. What makes it different when it's a disk? The difference is simply that the disk commission is a safe harbor protected amount of money. The amount paid in Repeto is simply a sham transaction. And why isn't the disk a sham transaction? Because Congress says it's not. It's fairly simple. If I can take just a few seconds on it. The Caterpillar case is one of the first cases involved a disk and a Western Hemisphere Trade Corporation both designed solely to minimize taxes. There was a regulation that said you couldn't pay a commission from a disk to a WHTC. The court of claims in the appellate portion said that the regulation was invalid. There was nothing to prevent the combination of two tax minimizing statutes, and that's the only purpose for them in the first place. Actually, the WHTC took the place of the disk. The First Circuit said there was no privity because the kids couldn't be shown to be in control, but the Benenson's were in control, so the privity issue is before this court because the Benenson's were in control of the company. Let me ask you, is that true at the time of the Sixth Circuit litigation? I mean, as I understood the record, we could reach that conclusion up to a certain point in time, but where do we look for it being true at the time of the Sixth Circuit litigation? And that's a very good question because at the time of the Sixth Circuit litigation, the stock had already been transferred to the children, and so we thought our position was, well, they are in control. The parents were in control during the time there was an issue. The First Circuit says, well, too late. We're not going to accept any proof of this fact. And so that's the problem for us, isn't it, that the First Circuit didn't want to open up the question, but we know that your position in the First Circuit was that by that time the control had passed to the sons. Well, our position was that take a look. This is a family operation, and if you look at the family, it's the same control. It just moves around a little bit, and from that we agree. It's just why does that make any difference? The disk has deemed services deemed to be committed or performed. That's why the disk gets its commission. It's a deemed commission for services rendered, and it's treated the same as if it was a buy-sell disk where it's actually purchased and resold property. So it's not a sham. It's designated to be a transaction for services, even though everybody knows there's no services rendered. If I could just add one other thing. And we're going to ask you to close. Okay. Just one thing. Okay, I'll just end. There is a hole in the dike. It's exports flowing out of the country, and that's where the hole is. Thank you. Thank you. We kept both sides quite long, but we appreciate your taking the time to answer our questions. We'll take the matter under advisement, and I think our last case is on submission, so we stand adjourned.